**SO ORDERED.**

**SIGNED this 12th day of November, 2024.**



Dale L. Somers
United States Chief Bankruptcy Judge

---

**Designated for online publication only**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| In re:<br><br>**Rocking M Media, LLC, et al.,**<br><br>                    **Debtors.**[1] | **Case No.  22-20242**<br>**Chapter 11** |

## Memorandum Opinion and Order
### Resolving Dispute between Debtors and Allied Media Partners
### Regarding Entitlement to Earnest Money Deposit

Prepetition, two debtors in these jointly administered proceedings,

Rocking M Media, LLC and Rocking M Wichita, LLC (collectively RMM or

Debtors), as sellers, and Allied Media Partners, LLC (AMP), as buyer, entered

---

[1] The Debtors in these Chapter 11 cases, their case numbers, and acronyms are: Rocking M Media, LLC (RMM), case no. 22-20242 (lead case); Rocking M Media Wichita, LLC (RMMW), case no. 22-20243; Rocking M Radio, Inc. (RMR), case no. 22-20244; and Melia Communications, Inc. (MCI), case no. 22-20245.

into a Purchase and Sale Agreement (PSA) for transfer of the FCC licences for eight radio stations and related assets (Stations). AMP provided a $300,000 Earnest Money Deposit. The sale did not close. Debtors and AMP both claim entitlement to the deposit, asserting the other party breached the PSA in multiple ways, including inability to satisfy the conditions for closing. Trial was held on August 13 and 14, 2024.[2] The Court has jurisdiction over the dispute[3] and for the following reasons, finds that RMM is entitled to the Earnest Money Deposit and accrued interest.

## I. Background and Findings of Fact

## A. Procedural Background

The PSA is dated March 29, 2019. Also on March 29, 2019, the parties entered into a Local Marketing Agreement (LMA). Consent to the transfers of

---

[2] As discussed in more detail below, the matter is before the Court on Debtors' objection to the proofs of claim of AMP, Doc. 381, and AMP's response thereto, Doc. 410. At trial, Debtors' position was presented by the Official Committee of Unsecured Creditors, appearing by Schuyler G. Carroll of Manatt, Phelps & Phillips LLP. AMP appeared by Kevin M. McMaster of McMaster & McMaster, LLC.

[3] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of Reference of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order No. 13-1. Determination of objections to proofs of claim and the estate's interest in property are core proceedings which this Court may hear and determine as provided in 28 U.S.C.§ 157(b)(2)(B) and (E). In the pretrial order, the parties stipulated to the Court's jurisdiction over the parties and the subject matter of the action.

2

the radio licenses was requested and obtained from the FCC. The LMA allowed AMP to broadcast its programming on the Stations for a maximum term of nine months, unless earlier terminated by mutual agreement or termination of the PSA. AMP was responsible for sale of advertising, collection of accounts, and payment of expenses and a monthly fee to RMM.

The PSA was not closed before August 29, 2019, the date the FCC's consents to the transfer of the licenses for the Stations expired. RMM gave AMP notice of default and termination of the PSA. RMM filed suit in Saline County, Kansas District Court[4] against AMP seeking a declaratory judgment that AMP breached the PSA, that the Earnest Money Deposit was due to RMM, that AMP breached the LMA, and that RMM was entitled to damages as a result of the breach and possession of the property that was the subject of the LMA. AMP answered and counterclaimed for intentional misrepresentation, breach of contract, and a declaration that AMP was entitled to the Earnest Money Deposit. Discovery was undertaken. A pretrial conference was scheduled for May 3, 2022.

On March 26, 2022, RMM filed for relief under Chapter 11, resulting in a stay of the state court proceeding. The assets listed in Debtors' schedules

---

[4] *Rocking M Media, LLC and Rocking M Media Wichita, LLC v. Allied Media Partners, LLC*, Saline County, Kansas District Court, case no. 19 CV 0204.

3

include the cause of action against AMP pending in Saline County, Kansas District Court seeking an order that RMM is entitled to the Earnest Money Deposit. AMP filed proofs of claim for $25,640,000 based upon alleged breach of contract and misrepresentation. The claims included demand for turnover of the Earnest Money Deposit.[5] RMM objected to the proofs of claim,[6] asserting AMP's claims are false and AMP is indebted to RMM. AMP filed for relief from stay to litigate the controversy between AMP and RMM in state court. Objections were filed. After hearing, the Court ruled the stay would not be lifted, trial of RMM's objections to AMP's proofs of claim would commence in this Court, and the initial litigation would be "limited to determining which party, AMP or Debtors, is entitled to the $300,000 earnest money deposit."[7]

## B. Findings of Fact[8]

The individuals directly involved in this dispute are: Matt Baty, the managing member and CEO of AMP; Scott Pohl, AMP's counsel; Quinn

---

[5] Case no. 22-20242, POC 3; case no. 22-20243, POC 4.

[6] Doc. 381.

[7] Doc. 588 at 4.

[8] At trial, each party offered numerous exhibits, which were admitted without objection. AMP's exhibits are identified alphabetically and RMM's numerically. The Court has carefully reviewed each.

Miller, who before the PSA and LMA was engaged on behalf of RMM in marketing, promotions, and operations of the Stations; Doris and Monte Miller, parents of Quinn Miller and owners of RMM; Steven H. Mustoe, state law counsel for RMM; and Chris Imlay, FCC counsel for RMM. AMP did not retain FCC counsel.

In early 2019, RMM owned several radio licenses and associated equipment in south central Kansas. RMM acquired the Stations several years earlier, but they were not profitable. In January 2019, Matt Baty contacted Quinn Miller about purchase of the Stations. On February 4, Matt Baty met with Quinn Miller, Doris Miller, and Monte Miller to discuss the possibility of a sale. The Millers believe they were transparent about the multiple liens encumbering the assets. Doris Miller remembers having presented a print out of the RMM debts. Agreement was reached. AMP was formed for the purpose of acquiring the Stations from RMM.

The resulting contract, between RMM, as sellers, and AMP, as purchaser, was the PSA dated March 29, 2019, whereby AMP would become the owner of the Stations and the associated broadcast facilities and FCC licenses.[9] The contract price was approximately $6 million, $300,000 of which was to be delivered on the date of the PSA as an Earnest Money Deposit to be

---

[9] Exh. A; Exh. 1. For simplicity, the Court will cite to Exhibit A hereafter.

held by a title company. AMP made the deposit. In accord with the PSA, AMP and RMM jointly applied to the FCC for consents to the assignment of the licenses to AMP. The FCC granted consents on May 30, 2019.[10] The consents include the proviso that "the actual consummation" of the sale transaction be completed within ninety days of the notice of consents, or by August 29, 2019.

An investor who was an acquaintance of Matt Baty orally committed to fund the purchase and provided the cash for the Earnest Money Deposit. He advised AMP that additional capital would be invested after he had reviewed the closing documents, including lien releases. He relied on Mr. Pohl, AMP's counsel, to assure all needed documents had been provided. As a backup financing option, on June 3, 2019, an additional investor made a commitment to AMP to provide $5.9 million to fund the PSA.[11] This second commitment provided AMP with a backup plan if the initial investor did not want to close the transaction.

When the PSA was executed, the assets being sold secured various debts of RMM, including those held by Envision, Belate, Bank of Commerce, Farmers and Merchant Bank, and Kansas State Bank. Generally, RMM planned to satisfy the debts with the sale proceeds or otherwise negotiate lien

---

[10] Exh. 10.

[11] Exh. C.

releases. Shortly after receipt of FCC consents to the license transfers, the buyer and seller undertook determining the various payoff amounts and required documentation. Monte Miller had participated in many similar transactions and was confident that all liens would be released and the sale timely closed. Neither Doris nor Monte Miller were directly involved in obtaining the closing documents; they relied on RMM's counsel, Mr. Mustoe.

On May 24, 2019, by letter to RMM's counsel, Mr. Pohl enumerated the documents AMP required for closing, including the following: twelve UCC lien releases; eight mortgage releases; copies of two tower leases; three vehicle certificates of title; numerous copies of miscellaneous contracts enumerated in schedules to the PSA; and information about pending litigation.[12] At trial, neither party offered evidence addressing compliance or noncompliance with each of these specific requests. Rather, through testimony and exhibits, the Court was provided evidence that some, but not all, of the most important documents were provided.[13] By July 30, RMM and Belate had reached agreement for the release of Belate's lien, the largest encumbrance of the

---

[12] Exh. B.

[13] *E.g.*, Exh. E at 2 (Aug. 1, 2019 email from Pohl to Mustoe at 9:09 AM); Exh. F at 1-2 (Aug. 2, 2019 email from Pohl to Mustoe at 11:34 AM).

7

assets.[14] By approximately the same date, Kansas State Bank had agreed to provide a disclaimer as to the assets being sold.[15] By email dated August 2, Mr. Mustoe inquired of Mr. Pohl whether several proposed documents, including those for Belate and Kansas State Bank, were satisfactory and whether AMP would have funds available to close on August 7 or 8.[16] Mr. Pohl responded by providing his current document check list and stating "there are still several items that remain open and need to be completed," such that the PSA could not be closed by August 7.[17]

Obtaining consent and documentation from Envision, one of RMM's lien creditors, was problematical. The parties, rather than counsel, negotiated with Envision.[18] In April 2017, Envision and RMM entered into a contract whereby RMM purchased from Envision one of the Stations being sold to AMP.[19] The transaction included a lease of real property. Envision was given a promissory note, secured by the purchased assets. On February 5, 2019,

---

[14] Exh. D.

[15] Exh. 40.

[16] Exh. F at 3 (Aug. 2, 2019 email from Mustoe to Pohl at 10:51 AM).

[17] *Id*. at 1-2 (Aug. 2, 2019 email from Pohl to Mustoe at 10:34 AM).

[18] *See e.g.*, Exh. E at 1 (Aug. 1, 2019 email from Pohl to Mustoe at 10:23 AM); Exh. P at 1.

[19] Exh. O.

before the PSA was executed, Envision declared a default and accelerated the note. A forbearance agreement was executed on February 27, extending payment until to August 1, 2019 or to October 1, 2019, upon certain conditions. Matt Baty was not advised of the Envision debt or default before signing the PSA, but he later worked with Quinn Miller to negotiate the terms for release of the Envision liens. On August 1, Mr. Mustoe advised Mr. Pohl that their clients would get with Envision and "work it out."[20] On August 2, Mr. Pohl was working through the Envision issues.[21] Quinn Miller testified he was confident that if a closing had occurred, an agreement would have been reached with Envision.

RMM desired to close the transaction quickly after the PSA was signed and FCC consents given. But by the end of July, Quinn Miller sensed that Matt Baty's initial enthusiasm was beginning to wane because operational problems were becoming evident as AMP operated the Stations under the LMA. On August 1, Mr. Mustoe advised he would have everything ready to close by August 2,[22] but Mr. Pohl responded with concerns about the Envision

---

[20] Exh. E at 1 (Aug. 1, 2019 email from Mustoe to Pohl at 10:39 AM).

[21] Exh. F at 1-2 (Aug. 2, 2019 email from Pohl to Mustoe at 11:34 AM).

[22] Exh. E at 2 (Aug. 1, 2019 email from Mustoe to Pohl at 9:15 AM).

9

pay off[23] and other open items.[24] On August 7, Mr. Mustoe advised Mr. Pohl that RMM was ready to close and suggested a closing date of August 20 to 23.[25]

The prospects for closing the PSA soon changed significantly. On August 14, Matt Baty advised Quinn Miller that although AMP had investors with money set aside for the project, the investors wanted AMP to "show with a cash investment into operations what we would be able to do by the end of the year."[26] Further, Matt Baty stated AMP had decided "to go another direction" with financing. The initial investors had committed to financing in exchange for equity interests in AMP; the "new direction" was for debt financing. AMP presented two offers to Quinn Miller and his parents. The first offer was for the original "Deal," but with a four month extension. The second offer would amend the PSA to include additional stations, increase the price to $15,000,000 and extend the closing date by four months. It was clear as of August 14, 2019, that AMP's investors were not agreeable to closing before the FCC consents expired on August 29.

---

[23] *Id*. (Aug. 1, 2019 emails from Pohl to Mustoe at 9:27 AM, 10:09 AM and 10:31 AM).

[24] Exh. F at 1-2 (Aug. 2, 2019 email from Pohl to Mustoe at 11:34 AM).

[25] Exh. G at 1 (Aug. 7, 2019 email from Mustoe to Pohl at 11:21 AM).

[26] Exh. 16.

On August 16, Mr. Mustoe advised Mr. Pohl he had everything ready to close on August 30.[27] He also reported, based upon a conversation with Quinn Miller, that Matt Baty had reiterated his inability to close; that AMP desired to amend the deal; that Quinn Miller wanted to get AMP an extension; and Quinn thought Doris and Monte Miller would agree to an extension. On August 20, Mr. Pohl advised Mr. Mustoe of the terms of the requested three to four month extension that had been requested by Matt Baty on August 14.[28] Alternatively, if the requested extension could not be agreed upon, Mr. Pohl stated AMP would have no choice but to acknowledge RMM's request to close on August 30, and undertake a review of documentation to be sure the Millers provided everything required under the PSA.

On August 22, Mr. Mustoe proposed a no change thirty-day extension to permit AMP to get funding together,[29] and on August 30, Mr. Imlay (RMM's FCC counsel) sent Mr. Pohl a proposed amended PSA.[30] But in the view of Mr. Pohl, the proposal did not reflect the parties' discussions. An extension

---

[27] Exh. H.

[28] Exh. I at 1 (Aug. 20, 2019 email from Pohl to Mustoe at 6:20 PM).

[29] Exh. J at 2 (Aug. 22, 2019 email from Mustoe to Pohl at 9:09 AM).

[30] Exh. L.

11

was never finalized, a closing date was never agreed upon, and the PSA was not closed.

On September 11, 2019, Mr. Imlay on behalf of RMM sent a notice of default and termination of the PSA to AMP and Mr. Pohl.[31] The notice recited that a closing was authorized any time within 90 days of FCC consents to the proposed transfer. That closing period expired on August 29. No extension was obtained, so closing of the PSA was no longer possible. The letter further recited that RMM had successfully negotiated with each of its creditors appropriate payoff agreements and was ready, willing, and able to close the transaction by the end of July. Closing dates in August were insisted upon by RMM, but AMP refused agree to a closing date and requested an extension until the end of 2019. Upon information and belief, Mr. Imlay asserted that one reason AMP refused to close was it was without funds from committed lenders to close the PSA.

The lease with Envision expired on September 21, 2019, but RMM did not vacate the premises. On September 22, 2019, Envision took possession of the leased premises.[32] About one month later, on October 19, 2019, Envision

_____

[31] Exh. 18.

[32] Exh. M.

12

filed suit on the note in Sedgwick County, Kansas District Court and to foreclose on its collateral in Harvey County, Kansas District Court.

Even though AMP believed it had grounds to declare a default and terminate the agreement in early September, it chose not to do so.[33] Almost two months later, on October 23, 2019 by letter to Monte Miller from Kevin McMaster, who had been retained to represent AMP, notice of termination of the PSA pursuant to section 15.2.3 was given by AMP.[34] That section provides the PSA may be terminated on written notice by the purchaser to the seller "(i) pursuant to Section 15.1 hereof provided Purchaser is not then in material breach of this Agreement." Section 15.1 provides that if prior to closing either party believes the other to be in material breach, the non-defaulting party may provide the defaulting party with written notice specifying the nature of the breach or default and if the alleged breach is not timely cured notice of termination may be given. The letter alleged default from Envision's actions on September 23, 2019.

## II. The parties' contentions

## A. The Pretrial Order

_____

[33] Exh. Q at 2.

[34] _Id._

13

Even though this is a contested matter rather than an adversary proceeding, the Court held a final pretrial conference and requested the parties to prepare a pretrial order,[35] which the Court adopted. That order stated, "trial of this matter is limited . . . to determining which party, Allied Media or Rocking M, is entitled to the $300,000 earnest money deposit."[36] Each party stated its contentions and theories of recovery. In general they reflect the premise that entitlement to release of the Earnest Money Deposit is a remedy for breach of the PSA by the other party.

For unknown reasons, neither of the parties' contentions mentioned any section the PSA. This is curious, since the PSA defines the conditions for closing the sale transaction. Even more curious is the failure of both parties to mention section 15.4 of the PSA, which directly addresses the conditions for release of the Earnest Money Deposit. Because the Court was not provided a copy of the PSA until the eve of trial, there was no basis for the Court to suggest amendment of the statements of issues and contentions.

---

[35] Federal Rule of Bankruptcy Procedure 9014 addresses contested matters. Rule 7016, which defines pretrial procedures in adversary proceedings, is not one of the Rules made applicable to contested matter by Rule 9014(c), but that subsection provides, "The court may at any stage in a particular matter direct that one or more of the other Rules in Part VII shall apply."

[36] Doc. 667 at 1.

A pretrial order "controls the action unless the court modifies it."[37] Because of the failure of the pretrial order to relate the contentions and theories of recovery to the PSA section addressing release of the Earnest Money Deposit, there is a "disconnect" between the pretrial order and the reason for the trial. The Court therefore will resolve this case by first making conclusions of law relating the parties' contentions based on the evidence presented and second rule on which party is entitled to the Earnest Money Deposit under section 15.4 of the PSA.

## B. RMM's Contentions and Theories of Recovery

As stated in the pretrial order, RMM contends AMP was never financially able to consummate the PSA and AMP's failure to close the PSA was a breach of the contract entitling RMM to the Earnest Money Deposit and any accrued interest. Further, RMM asserts it was not required to provide documents showing its ability to convey clear title in the advance of closing and it repeatedly advised AMP that RMM was willing and able to close.

## C. AMP's Contentions and Theories of Recovery

AMP's allegations as stated in the pretrial order are the following. First, AMP denies it breached the PSA and alleges RMM failed and refused,

---

[37] Fed. R. Civ. P. 16(d).

as required by the PSA, to provide proof it its ability to sell all assets free and clear of all encumbrances. Second, AMP alleges RMM made incomplete and inaccurate representations in the PSA. Third, AMP asserts the PSA required RMM to provide proof of their ability to convey title before any closing was scheduled or conducted, and, since RMM never provided the requested documents, a closing was never scheduled. Fourth, AMP alleges RMM allowed assets AMP was purchasing to be seized, making performance impossible.

## III. Analysis

### A. AMP's allegations of RMM's breach of contract

In this proof of claim litigation, although the burden of providing evidence shifts, "the creditor has the ultimate burden of persuasion as to the validity and amount of the claim."[38] Since AMP's claim for return of the Earnest Money Deposit is predicated on an alleged breach of contract by RMM, the Court begins its analysis by discussing AMP's allegations of breach of contract.

AMP's primary contention, to which much of the trial was devoted, is stated as issues one and three in the pretrial order. That contention is that RMM breached the PSA by failing to provide, before a closing date was

---

[38] *Harrison v. Harrison (In re Harrison)*, 987 F.2d 677, 680 (10th Cir. 1993).

16

scheduled, the documents enumerated in Mr. Pohl's May 24, 2019 email as necessary to transfer unencumbered title to the PSA assets.[39] These documents include: twelve UCC lien releases; eight mortgage releases; copies of two tower leases; three vehicle certificates of title; numerous copies of miscellaneous contracts enumerated in schedules to the PSA; and information about pending litigation. The record does not include the closing documents prepared by RMM, but on several occasions RMM stated it was ready to close. The evidence also does not identify the documents RMM submitted to AMP for review, but the Court concludes that significantly less than all documents which would have been required at a closing were submitted.

AMP's allegation of RMM's breach because of failure to provide all necessary documents ten days in advance of closing is predicated on sections 7.2.1 and 8.1.4 of the PSA. Section 7.2.1 provides as a condition to the purchaser's obligation to close that "Purchaser shall have received the instruments and other documents (in form reasonably satisfactory to its counsel) required to be delivered by section 8.1."[40] Section 8.1 provides "[a]t the *Closing*" the seller shall deliver the following documents to AMP: bills of

---

[39] Exh. B.

[40] Exh. A at 15.

Case 22-20242    Doc# 684    Filed 11/12/24    Page 17 of 30

sale (section 8.1.1); assignments of leases (section 8.1.2); assignment and assumption agreements (section 8.1.3); and "[o]ther instruments or documents as Seller or Purchaser may reasonably request at least ten days prior to Closing" (section 8.1.4).[41] Contrary to AMP's position, the Court interprets the reference to ten days in section 8.1.4 as defining when desired documents, in addition to those described in the preceding section 8.1.1 through 8.1.3, must be requested. The ten days does not require documents to be provided at least ten days prior to closing. The Court's interpretation is reinforced by section 7.2.1, which provides, as a condition to the purchaser's obligation to close, that "at or prior to the *Closing*" the purchaser shall have received the documents required to be delivered by section 8.1.[42] There is no mention of the ten-day time period in section 7.2.1. The PSA required RMM to provide documents at or prior to closing. RMM did not breach the PSA by failing to deliver all the documents AMP requested ten days prior to a possible closing date.

As the second issue, AMP argues RMM breached the PSA because the seller's representations made in section 3.4 of the PSA were not true. That

_____

[41] *Id.* at 17 (emphasis supplied).

[42] *Id.* at 15 (emphasis supplied).

18

section includes as a seller's representation and warranty that "Seller has good, valid and marketable title" to the assets and licenses being purchased.[43] AMP erroneously reads section 3.4 as a representation and warranty that as of the date of the PSA the assets being purchased were free and clear of liens and similar interests. Good and marketable title does not require freedom from liens and similar interests.[44] This is made clear by the second sentence of section 3.4, which states, "On the Closing Date" the assets "shall be transferred to Purchaser free and clear of all mortgages, deeds of trust, security interests," and other similar interests.[45] The fact that the assets were subject to liens and security interest on the date of the PSA was not a breach of warranty that RMM held marketable title on such date.

As to breach of warranty, AMP also alleges RMM breached representation and warranty section 3.6 regarding litigation. In that section RMM warranted that "there are no claims, actions, suits, inquiries, hearings, or investigations pending , . . disputing Seller's ownership of the Stations or

---

[43] *Id*. at 7.

[44] "[A] marketable title is one which does not contain any manner of defect or outstanding interests or claim which may conceivably operate to defeat or impair the interest . . . intended to be conveyed." Black's Law Dictionary 1794 (12th ed. Bryan A. Garner, chief editor 2024).

[45] Exh. A. at 7.

the Broadcasting Assets."[46] AMP argues the representation was false because of Envision's claim against RMM. The Court does not agree. In April 2017, RMM purchased from Envision one of the Stations and related assets being sold pursuant to the PSA. As part of the transaction, RMM leased real property related to the operation of the Stations from Envision. Envision was given a promissory note, secured by the purchased assets. On February 5, 2019, before the PSA was executed, Envision declared a default and accelerated the note. A forbearance agreement was executed on February 27, 2019, extending payment until August 1, 2019 or to October 1, 2019, upon certain conditions. Envision's claim was for money; Envision did not threaten or dispute RMM's ownership of the Stations or other related assets. The existence on March 29, 2019 (when the PSA was executed), of the Envision claim was not a breach of the section 3.6 warranty.

Finally, as its fourth allegation, AMP asserts RMM prevented AMP from performing under the PSA because "upon the advice of counsel, [RMM] allowed assets [AMP] was purchasing to be seized and transmitters turned off . . ., preventing" AMP from performing the PSA.[47] This allegation is also

---

[46] *Id.*

[47] Doc. 667 at 2.

Case 22-20242   Doc# 684   Filed 11/12/24   Page 20 of 30

based upon RMM's transaction with Envision. On September 21, 2019, RMM's lease with Envision expired, and on the next day Envision took possession of the leased premises. Contrary to AMP's assertion, this did not interfere with AMP's performance of the PSA. The FCC deadline for consummation of the PSA expired on August 29, 2019, before the Envision lease expired. In addition, the PSA was terminated by Mr. Imlay's sending the notice of default and termination of the PSA to AMP on September 11, 2019, also before the Envision lease expired.

Although not included in the pretrial order, at trial AMP directed much of the testimony to the contention that RMM was not capable of satisfying the conditions for closing the transaction because it could not provide all the necessary documentation. If a closing date had been agreed to and a closing attempted, whether RMM could have closed would have been established. This did not occur. Moreover, the trial record is not sufficient for the Court to project what would have happened if a closing had been held.

The Court finds RMM did not breach the PSA in any of the manners alleged by AMP.

## B.  RMM's allegation that AMP breached the PSA

21

RMM argues it was ready, willing, and able to close the sale transaction as soon as FCC approval was issued and that AMP's failure to close the PSA transaction was a breach of the PSA, entitling RMM to the Earnest Money Deposit and any accrued interest.

RMM attributes AMP's failure to close to AMP's alleged inability to pay the purchase price. But a closing date was never agreed upon and there was never a time when AMP was required to provide the funding. The record is not sufficient for the Court to determine whether funding would have been forthcoming if a closing had occurred.

The record clearly evidences that a closing date was never established despite RMM's proposal of several dates. The PSA definition of Closing Date is cumbersome. It states:

> "Closing Date" means a time and business date not later than five (5) days after the date on which the FCC Consent has been granted for all of the Stations, and all other conditions specified in Article VII hereof shall have been met (or if applicable waived), unless otherwise provided for herein or if Purchaser and Seller mutually agree to a different time and date. At purchaser's option, the Closing may be postponed until the date on which the FCC Consent has become Final.[48]

---

[48] Exh. A at 29.

The evidence convinces the Court that the parties agreed to close on a mutually agreeable date, rather than closing within five business days of the FCC consents. Other sections of the PSA imposed a limitation on the date to be selected. Section 7.1.1 of the PSA includes as a condition to seller's obligation to close, that "[t]he FCC Consent to the assignment of the FCC Licenses from Seller to Purchaser shall have been granted."[49] Because the FCC consents expressly provided that they were conditioned upon closing within ninety days and that expiration date was not extended, the mutually agreeable closing date had to be on or before August 29, 2019.

RMM alleges AMP's repeated rejections of closing dates suggested by RMM was because it never had the ability to make payment of the purchase price. The record does not support this allegation. Even if funding was a concern, there were additional plausible reasons. As to dates before mid August, the evidence supports the conclusion AMP was concerned about the failure of RMM to provide the closing documents well in advance of a closing date. This is a plausible explanation why AMP did not agree to a closing date, given the position of AMP's initial investor that he would not provide funds to close before he had reviewed the closing documents. AMP's reluctance could

---

[49] *Id.* at 14.

also have been because AMP's initial enthusiasm about the transaction was beginning to wear off as the problems with the Stations were becoming evident through AMP's operation of the Stations under the LMA.[50] But, because the FCC consents did not require consummation until August 29, 2019, and nothing in the PSA required the closing to be held before such date, AMP's failure to agree to a closing date before mid August was not a breach of the PSA.

The Court finds that AMP's failure to agree to a closing date after August 14 was for at least two reasons. First, AMP wanted to make a year-end evaluation of operation of the Stations under the LMA. Second, AMP changed its method for funding the PSA from what was initially contemplated. When the PSA was signed, the original investor had committed to fund the transaction in exchange for an equity interest in AMP, and on June 3 another investor committed to an equity investment up to $5.9 million by the end of August, when the FCC approvals expired. However, on August 14, Matt Baty informed Quinn Miller that his investors, although having cash available, did not want to release the funds before a year-end assessment of

---

[50] Doc. 310.

results of an investment into operation of the Stations.[51] Matt Baty further advised that AMP changed the proposed financing of the PSA from equity investment to loans. To accommodate these changes, AMP made two proposals for amendment of the transaction, each of which anticipated a closing in three to four months. Simply stated, AMP decided not to close the PSA unless amended. The Court concludes AMP's failure to agree to a closing date after mid August was to accommodate its desire to evaluate performance of the Stations after an investment in operations and to change the method of financing of the purchase.[52]

The May 30, 2019, FCC consents to the license transfers expressly provided the transaction be consummated within ninety days from the date of the consents, which was August 29, 2019. The parties verbally agreed to thirty-day extension of the closing date to late September, but AMP objected to the proposed extension agreement prepared by Mr. Imlay, which most likely included seeking approval of the FCC. An extension was not finalized.

---

[51] Exh. 16.

[52] In an email dated August 20, 2019, from Mr. Pohl to Mr. Musote, Mr. Pohl acknowledged if an extension could not be agreed to, he would have to present the option of closing on August 30 to his clients. The record does not include evidence that there was mutual agreement to close on August 30.

Because the FCC consents were not extended, this condition to RMM's

obligation to close terminated on August 29, 2019.

RMM sent a notice of default and termination of the PSA on September

11, 2019. With respect to the PSA, the letter concluded:

> Because AMP has failed to close this transaction;
> because it has done nothing at all to preserve the
> opportunity to close the transaction; [because] AMP has
> failed to agree to a specific closing date despite repeated
> requests to do so from counsel for RMM; and because
> there is no longer an outstanding FCC authorization to
> close the transaction, closing is not currently possible,
> and AMP cannot now perform on its obligations. The
> PSA is now deemed terminated and demand is made on
> AMP to notify the escrow agent to immediately release
> as liquidated damages for that breach the Earnest
> Money Deposit.[53]

The Court agrees with RRM's determination that because of AMP's actions,

closing the transaction had become impossible. Termination of the PSA by

RMM was therefor appropriate under section 15.2.2.[54]

## C. Entitlement to the Earnest Money Deposit

---

[53] Exh. 18 at 3.

[54] Section 15.2.2 provides:
This agreement may be terminated at any time prior to Closing as
follows: . . . 15.2.2 Seller. This Agreement may be terminated on written
notice by Seller to Purchaser (1) pursuant to Section 15.1 hereof provided
Seller is not then in material breach of this Agreement, or (ii) if both
Purchaser and Seller agree that any condition set forth in Section 7.2
cannot be met and has not been waived.
Exh. A at 22.

The PSA addresses the posting and release of the Earnest Money Deposit. Addendum A to the PSA, which establishes the purchase price, provides that concurrently with the execution of the PSA, $300,000 shall be deposited by AMP with Security 1st as an Earnest Money Deposit.[55] It further provides on the closing date the deposit was to be released to the seller as partial payment of the purchase price. Because the parties did not agree on a closing date and there was no closing, the foregoing condition for release is not applicable.

As examined above, the Court has found that RMM did not breach the PSA in the manner alleged by AMP. The Court has also found AMP decided not to schedule and participate in a closing prior to the expiration of the FCC consents. The Court has further found that RMM properly terminated the PSA when a closing became impossible. Release of the Earnest Money Deposit in the event of termination or breach is addressed by section 15.4 of the PSA. It provides in part:

> 15.4 <u>Remedies; Specific Performance; Release of Earnest Money Deposit</u>. . . [I]n the event of material breach by Seller . . . Purchaser shall be entitled to either: (i) specific performance . . . ; (ii) termination . . . in accordance with <u>Section 15.2.3</u> above and release to Purchaser of the Earnest Money Deposit and any

---

[55] *Id.* at 33.

> interest thereon . . .. [I]f this Agreement is terminated
> by any reason (other than pursuant to <u>Section 15.2.3(i)</u>
> as a result of Seller's breach or pursuant to <u>Section
> 15.2.4</u>), Seller shall be entitled to the Earnest Money
> Deposit, including the interest accrued thereon . . .[56]

The first sentence of section 15.4 provides for return of the Earnest Money

Deposit to AMP in the event of (1) RMM's material breach of the PSA and (2)

termination of the PSA in accord with section 15.2.3.[57] Because the Court has

found that RMM did not breach the PSA, the first condition is not satisfied.

As to the second condition, Section 15.2.3(i) provides for termination by the

purchaser "on written notice by Purchaser to Seller" pursuant to section 15.1

because of seller's material default, "provided Purchaser is not then in

material breach of" the PSA.[58] AMP attempted to give RMM written notice of

termination by letter dated October 23, 2019. That notice alleged RMM

breached because Envision took over the leased premises on September 23,

---

[56] *Id.* at 22.

[57] Section 15.2.3 provides:
This agreement may be terminated at any time prior to Closing as follows
: . . . 15.2.3 Purchaser. This Agreement may be terminated on written
notice by Purchaser to Seller (1) pursuant to Section 15.1 hereof provided
Purchaser is not then in material breach of this Agreement, or (ii) if both
Purchaser and Seller agree that any condition set forth in Section 7.2
cannot be met and has not been waived.
*Id.*

[58] *Id.* at 21.

Case 22-20242    Doc# 684    Filed 11/12/24    Page 28 of 30

2019. The Court has found that event did not constitute a material breach of the PSA. Further, the PSA had been earlier terminated by RMM. AMP is not entitled to the Earnest Money Deposit under the first sentence of section 15.4.

Sentence two of section 15.4 provides that RMM shall be entitled to the Earnest Money Deposit and interest if the PSA is terminated for any reason, unless the PSA was terminated under section 15.2.3(i) or section 15.2.4. As found above, the PSA was not terminated by AMP under section 15.2.3(i). Section 15.2.4 also does not apply. It provides for termination by passage of time "[i]f the FCC Consent to assign the FCC Licenses for the Stations has not become Final within twelve (12) months" of the date of the PSA. Here, the FCC consents became final in May.

Termination of the PSA was not because of RMM's breach and was other than pursuant to section 15.2.3(i) or section 15.2.4. Therefor, RMM is entitled to the Earnest Money Deposit in accord with section 15.4.

## IV. Conclusion

The Court concludes RMM did not breach the PSA in the manner alleged by AMP. The Court also concludes AMP breached the PSA by failing to agree to a closing date and participating in a closing prior to the expiration of the FCC consents to the transaction. Accordingly, under section 15.4 of the

Case 22-20242    Doc# 684    Filed 11/12/24    Page 29 of 30

PSA, RMM is entitled to the Earnest Money Deposit. RMM's objections to AMP's proofs of claim is sustained with respect to the Earnest Money Deposit and RMM's claim to the Earnest Money Deposit as property of the estate is sustained.

Per the Court's prior Order,[59] the Court will issue a notice of status conference in this case, so the parties may inform the Court whether they wish to contest the remaining issues in the objection to the proofs of claim.

**It is so ordered.**

**###**

---

[59] Doc. 588 at 4 ("Trial shall be limited to determining which party, AMP or Debtors, is entitled to the $300,000 earnest money deposit. After that determination, if the nonbreaching, prevailing party wishes to pursue a claim for contract damages, trial will be scheduled.").